UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF INDIANA

| | |
|---|---|
| CAROL A. WATKINS,<br><br>    Plaintiff,<br>vs.<br><br>MICHAEL J. ASTRUE, Commissioner<br> of the Social Security Administration,<br><br>    Defendant. | )<br>)<br>)<br>)      1:09-cv-01021-SEB-TAB<br>)<br>)<br>)<br>)<br>)<br>) |

**Entry Discussing Complaint for Judicial Review**

Carol A. Watkins ("Watkins") seeks judicial review of the denial by the Commissioner of the Social Security Administration ("Commissioner") of her application for Disability Insurance Benefits ("DIB") under the Social Security Act (the "Act"), 42 U.S.C. § 301, *et seq*.

For the reasons explained in this Entry, the Commissioner's decision must be **remanded for further proceedings.**

**I. Background**

Watkins applied for DIB on April 18, 2006, alleging an onset date of April 29, 2004. Her application was denied initially and upon reconsideration. Her request for a hearing before an Administrative Law Judge ("ALJ") was granted and a hearing was conducted on March 10, 2009. Watkins was present, accompanied by her attorney. Medical and other records were introduced into evidence. Watkins testified. The ALJ denied Watkins' application on April 15, 2009. On June 21, 2009, the Appeals Council denied Watkins' request for review, making the ALJ's decision final. *See Getch v. Astrue,* 539 F.3d 473, 480 (7th Cir. 2008). This action for judicial review of the ALJ's decision followed. The court has jurisdiction over this action pursuant to 42 U.S.C. § 405(g), which provides that "[a]ny individual, after any final decision of the Commissioner of Social Security made after a hearing to which he was a party, irrespective of the amount in controversy, may obtain a review of such decision by a civil action . . . in [a] district court of the United States."

The ALJ's decision included the following findings: (1) Watkins met the insured status requirements of the Act on December 31, 2006; (2) Watkins did not engage in substantial gainful activity during the period from her alleged onset date of April 29, 2004, through her date last insured of December 31, 2006; (3) through the date last insured, Watkins had the following severe impairment: degenerative joint disease of the left hip and knee; (4) through the date last insured, Watikins did not have an impairment or combination of impairments that met or medically equaled one of the listed impairments in 20 C.F.R. Part 404, Subpart P, Appendix 1; (5) through the date last insured, Watkins had the residual functional capacity ("RFC") to perform the full range of sedentary work as defined in 20 C.F.R. §404.1567(a); and (6) through the date last insured, Watkins was capable of performing past relevant work as an executive secretary, as this work did not require the performance of work-related activities precluded by her RFC. With these findings in hand, and through the application of applicable rules and regulations, the ALJ concluded that Watkins had not been under a "disability" as defined in the Act at any time from April 29, 2004, the alleged onset date, through December 31, 2006, the date last insured.

## II. Discussion

### A. Applicable Law

To be eligible for disability benefits, a claimant must prove she is unable to engage in any substantial gainful activity by reason of a medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than twelve months. 42 U.S.C. § 423(d)(1).

A five-step inquiry outlined in Social Security regulations is used to determine disability status. *Briscoe ex rel. Taylor v. Barnhart*, 425 F.3d 345, 351-52 (7th Cir. 2005).

> The ALJ must consider whether: (1) the claimant is presently employed; (2) the claimant has a severe impairment or combination of impairments; (3) the claimant's impairment meets or equals any impairment listed in the regulations as being so severe as to preclude substantial gainful activity; (4) the claimant's residual functional capacity leaves him unable to perform his past relevant work; and (5) the claimant is unable to perform any other work existing in significant numbers in the national economy. 20 C.F.R. §§ 404.1520, 416.920. A finding of disability requires an affirmative answer at either step three or step five.

*Id*. The claimant bears the burden of proof at steps one through four, and at step five the burden shifts to the Commissioner. *Id.* at 352.

The task a court faces in a case such as this is not to attempt a *de novo* determination of the plaintiff's entitlement to benefits, but to decide if the Commissioner's decision was supported by substantial evidence and otherwise is free of legal error. *Kendrick v. Shalala,* 998 F.2d 455, 458 (7th Cir. 1993). "Substantial evidence" has been

defined as "'more than a mere scintilla. It means such relevant evidence as a reasonable mind might accept as adequate to support a conclusion.'" *Richardson v. Perales,* 402 U.S. 389, 401 (1971) (quoting *Consolidated Edison v. NLRB,* 305 U.S. 197, 229 (1938)).

### B. Analysis

In this case, the ALJ concluded that although Watkins had a severe impairment consisting of degenerative joint disease of the left hip and knee, she could perform a full range of sedentary work, including her past relevant work as an executive secretary. Watkins argues that the ALJ's decision is not supported by substantial evidence.

Watkins first argues that the ALJ failed to adequately address whether her impairment met or equaled a listing. At step three of the analysis, the ALJ stated the following:

> Through the date last insured, the claimant did not have an impairment or combination of impairments that met or medically equaled one of the listed impairments in 20 C.F.R. Part 404, Subpart P, Appendix 1 (20 CFR 404.1525 and 404.1526).

(R. at 12).

The above sentence was the ALJ's entire "discussion" at step three. The ALJ did not mention any listing. In addition, there was no medical expert present at the hearing. Watkins asserts that the ALJ should have at least considered Listing 1.02A (dysfunction of a joint). Listing 1.02A requires the following:

> 1.02 Major dysfunction of a joint(s) (due to any cause): Characterized by gross anatomical deformity (e.g., subluxation, contracture, bony or fibrous ankylosis, instability) and chronic joint pain and stiffness with signs of limitation of motion or other abnormal motion of the affected joint(s), and findings on appropriate medically acceptable imaging of joint space narrowing, bony destruction, or ankylosis of the affected joint(s). With:
>
> A. Involvement of one major peripheral weight-bearing joint (i.e., hip, knee, or ankle), resulting in inability to ambulate effectively, as defined in 1.00B2b.

20 C.F.R. Part 404, Subpart P, Appendix 1, Listing 1.02A.

The Seventh Circuit has noted that regulations help define what is meant by an "inability to ambulate effectively," as required by Listing 1.02.

> The regulations state that "ineffective ambulation" is "defined generally" as requiring the use of a hand-held assistive device that limits the functioning of both upper extremities. See 20 C.F.R. pt. 404P, app. 1, § 1.00(B)(2)(a). But the regulations further provide a nonexhaustive list of examples of ineffective ambulation, such as the inability to walk without the use of a walker or two crutches or two canes; the inability to walk a block at a reasonable pace on

3

> rough or uneven surfaces; the inability to carry out routine ambulatory activities, like shopping and banking; and the inability to climb a few steps at a reasonable pace with the use of a single handrail. *Id.*

*Moss v. Astrue*, 555 F.3d 556, 562 (7th Cir. 2009).

There is nothing apparent from the ALJ's decision that he considered any particular listing. An ALJ's failure to mention appropriate listings, if combined with a perfunctory analysis in light of the evidence provided, may compel a remand. *Ribaudo v. Barnhart*, 458 F.3d 580, 583 (7th Cir. 2006) ("an ALJ should mention the specific listings he is considering and his failure to do so, if combined with a perfunctory analysis, may require a remand") (internal quotation omitted).

The Commissioner concedes that the ALJ failed to mention any listing, but responds that such an omission was harmless because Watkins failed to satisfy her burden of identifying evidence that her impairments met or equaled each of the criteria of Listing 1.02A. The court cannot agree with the Commissioner's position. As noted above, Listing 1.02A provides that an individual must demonstrate (1) a gross anatomical joint deformity, (2) chronic joint pain and stiffness or other limitation in motion, (3) medical imaging documenting the abnormality, and (4) an inability to ambulate effectively. In her brief, Watkins pointed to a large number of records that supported Watkins' claim of severe degenerative joint disease of the left hip with guarded prognosis, near complete joint space loss, extensive bony sclerosis and subchondral cystic formations, almost complete ankylosis of the joint and complicated ability to mobilize, all documented by x-ray, severe hip pain, limited range of motion, and the use of a cane and walker.

The record shows that Watkins had a left ankle fracture in April of 2004. (R. at 162). She used a walker for a period of at least several weeks, and then wore an air cast and splints for months. (R. at 158, 160, 162). It took seven months for the fracture to heal to the point where her pain was only mild or occasional. (R. at 154).

In August 2005, x-rays showed "severe degenerative arthritis of her left hip" and mild degenerative changes in the left knee. (R. at 172). On August 31, 2005, orthopaedic physician Dr. Kerpsack gave a "guarded prognosis for her with the severe disease that she has in the hip." *Id.* Watkins had popping and catching in the left knee, and her left hip would freeze on occasion. *Id.* Her hip pain was much worse than in the knee. *Id.* Her hip pain started in the groin region and went all the way down the thigh. *Id.* Dr. Kerpsack's report reflected Watkins' having had left knee pain for about two years. *Id.* Dr. Kerpsack recommended injections into the left knee in hopes of relieving some of the pain. *Id.* On examination, Watkins had flexion to only about 90 degrees with some crepitation in her left hip, she had very limited internal and external rotation, and she had mild crepitation of her left knee and some diffuse joint line tenderness. *Id.* In October 2005, Watkins' left hip pain was worse, she continued to have a lot of locking, catching and popping in the left knee, and she had been using a cane due to the pain. (R. at 170). The physician reported "limited hip motion with a lot of pain." *Id.* "Examination of the left knee reveals a positive McMurray in the lateral compartment," and the physician opined that there probably was a left knee lateral maniscus tear. (R. at 169-70). Dr. Kerpsack reportedly told Watkins in July of 2005 that she needed hip replacement surgery, but she should not have it until she was 60 years

4

old. (R. at 197). Watkins would not be 60 until March of 2007.

In May 2006, Watkins saw a different orthopedic surgeon, Dr. Bartley, who noted that Watkins had been walking with a limp for over a year, that Dr. Kerpsack's injection protocol had been totally ineffective in alleviating pain, and that Watkins had extremely limited range of motion and no internal or external rotation. *Id.* Dr. Bartley opined that Watkins could not wait until she was 60 to have the surgery. *Id.* The x-rays showed advanced ankylosis of the left hip and complete loss of joint space, a trace of spondylosis of the lumbar spine, and mild early changes suggestive of either a bone island or early degenerative joint disease in the right hip. (R. at 198, 206). Dr. Bartley opined that Watkins had advanced ankylosis and degenerative arthritis of her left hip that justified a total hip replacement. (R. at 198). The surgery was performed in June of 2006. *Id.* The June 13, 2006, discharge summary reflected that Watkins had had "a long history of degenerative arthritis of the left hip and was ambulating with the use of a cane and in intense discomfort at all times." (R. at 218). Prior to surgery Watkins "was evaluated and found to have far-advanced arthritis changes of her left hip with almost complete ankylosis of the joint." *Id.*

Of significant concern is the fact that the ALJ gave very short shrift to the 2005 evidence. It is undisputed that as of June 2006, and at least a year before then, Watkins' severe hip degeneration and pain required surgical replacement. This condition did not arise over night. The ALJ's only reference to the objective evidence in 2005 was to x-rays of the *lumbar spine* in June and October 2005. (R. at 13). He noted that the October x-ray revealed overall bone mineral density within normal limits of the lumbar spine and as to the hip bone, there was mineral density still within normal limits but a statistically significant worsening as compared to the June 17, 2005, x-ray. *Id.* The ALJ noted in passing that Watkins "was advised by Dr. Kerpsack last July with regard to a total hip replacement" and that Dr. Kerpsack did an injection protocol which was totally ineffective in alleviating her symptoms. (R. at 12). The ALJ failed to assess in the context of Listing 1.02A the significant hip degeneration and pain for two years noted by Dr. Kerpsack in 2005, the lack of range of motion, the locking and freezing, and the left knee maniscus tear.

The ALJ did not cite to any medical evidence in concluding that Watkins' impairments did not meet or equal a listing, nor did he consult a medical expert at the hearing.[1] Under these circumstances, there is no basis for meaningful judicial review. In light of the medical evidence of record, the ALJ's failure to discuss Listing 1.02A is a basis for remand. *Ribaudo,* 458 F.3d at 583.

Watkins' second argument is that the ALJ failed to properly analyze Watkins'

---

[1] The Commissioner asserts that the State Agency physicians predicted that within one year of surgery Watkins could have performed light work (R. at 13, 465-472), and that this opinion supported the ALJ's step three decision. It is clear from the State Agency report that they based their opinion on only the status-post hip replacement evidence. (R. at 465-66) (citing hip replacement of June 13, 2006, the July 26, 2006, examination and an August 16, 2006, follow up note). *Id.* The ALJ did not cite to these opinions at step three of his decision, nor is there any indication that he or any other medical expert considered the pre-surgery evidence in determining whether Watkins' impairments satisfied Listing 1.02A.

5

credibility. Watkins asserts that the ALJ failed to consider a number of the required factors. The ALJ's summation of his credibility determination was the following:

> After careful consideration of the evidence, I find that the claimant's medically determinable impairment could reasonably be expected to cause the alleged symptoms; however, the claimant's statements concerning the intensity, persistence and limiting effects of these symptoms are not credible to the extent they are inconsistent with the above residual functional capacity assessment.

(R. at 12).

Thus, the ALJ acknowledged that Watkins had a medically determinable impairment that could cause "the alleged symptoms." The court cannot ascertain on what basis Watkins' statements were inconsistent with the ALJ's conclusion that Watkins could perform the full range of sedentary work.[2] *Id.* This kind of conclusory assessment "turns the credibility determination process on its head" because the ALJ failed to evaluate Watkins' credibility as an initial matter and explain the weight given to the claimant's statements. *Brindisi v. Barnhart*, 315 F.3d 783, 788 (7th Cir. 2003). The ALJ's only other reference to Watkins' credibility was his conclusion that "her testimony is not supported by the medical record." (R. at 14).

The ALJ recited the relevant regulations and Social Security Rulings when he discussed his obligation to make a credibility finding. (R. at 12, citing 20 C.F.R. § 404.1529, SSR 96-4p, and SSR 96-7p). The ALJ did not recite them, but the factors that are to be considered include daily activities; the location, duration, frequency, and intensity of pain or other symptoms; precipitating and aggravating factors; the type, dosage, effectiveness, and side effects of any medication taken to alleviate pain or other symptoms; treatment, other than medication, received for relief of pain or other symptoms; any measures used to relieve pain or other symptoms (e.g., lying flat on your back, standing for 15 to 20 minutes every hour, sleeping on a board, etc.); and any other factors concerning functional limitations and restrictions due to pain or other symptoms. 20 C.F.R. § 404.1529.

"[T]he ALJ should look to a number of factors to determine credibility, such as the objective medical evidence, the claimant's daily activities, allegations of pain, aggravating factors, types of treatment received and medication taken, and functional limitations. *Simila v. Astrue*, 573 F.3d 503, 517 (7th Cir. 2009) (citing 20 C.F.R. § 404.1529(c)(2)-(4) (quotation omitted)). Watkins points out that the ALJ made no reference to Watkins' activities of daily living, no mention of the duration, location or frequency of pain, and gave

---

[2]"Sedentary work involves lifting no more than ten pounds at a time, and occasionally lifting or carrying articles like docket files, ledgers, and small tools[,] 20 C.F.R. § 404.1567(a); sitting for approximately six hours during an eight hour work day; standing or walking for less than two hours during an eight hour work day; and the use of one's hands and fingers to perform repetitive actions, Social Security Ruling 83-10 (PPS-123: Determining Capacity to Do Other Work)." *Keith v. Barnhart*, 473 F.3d 782, 784 n.4 (7th Cir. 2007) (internal quotation omitted).

little to no discussion of factors that precipitated or aggravated her symptoms, of whether there were medication side effects, or of the measures Watkins had used to try to relieve pain.

The Commissioner responds that the ALJ considered several of the factors in assessing Watkins' credibility, such as the objective evidence, her treatment history, and the physicians' diagnoses and opinions. "[T]he absence of objective medical evidence supporting an individual's statements about the intensity and persistence of pain or other symptoms is only one factor that the adjudicator must consider in assessing an individual's credibility and must be considered in the context of all the evidence." SSR 96-7p,1996 WL 374186, at *6. Moreover, the ALJ failed to explain how the objective record, treatment history and physicians' opinions did *not* support Watkins' complaints of severe pain and difficulty walking. As discussed above, the ALJ did not give adequate consideration to significant portions of the objective record. The court cannot trace the path of the ALJ's reasoning from the objective evidence to his conclusion that Watkins did not experience pain, difficulty walking and moving her left leg sufficient to prevent her from performing even sedentary work full-time.

The Commissioner further states that the ALJ considered Watkins' medications which Watkins stated were ineffective, her other treatment which included steroid injections which were effective, and the fact that physical therapy provided some increased mobility but still left her uncomfortable and sore. The ALJ, however, merely mentioned these circumstances. The ALJ did not provide any link between, on the one hand, the ineffective attempts at treatment and the continuing severe pain and, on the other hand, his conclusion that Watkins was not fully credible and could perform full-time work. The Commissioner acknowledges the ALJ's failure to discuss Watkins' daily activities but contends that Watkins failed to cite any evidence that would support a finding of disability. The complete failure by the ALJ to discuss Watkins' daily activities cannot be so easily dismissed. The undisputed evidence of Watkins' extremely limited daily activities, caused by pain and degenerative hip and knee disease, was part of the documentary record as well as part of the hearing transcript. Its omission from the analysis is glaring.

In Watkins' written description of her daily activities dated June 5, 2006, she stated that she had trouble sleeping because it hurt to lay down. (R. at 121). She was able to sleep probably 3 hours a night. *Id.* She used a walker and it took her 5 minutes just to get to the bathroom which was only a few steps away. *Id.* She sat during the day because it hurt too much to do anything else. *Id.* She was in constant pain. *Id.* It was difficult for her to concentrate long enough to write checks and pay bills. *Id.* She could not play with her grandchildren. Her husband had to help her with everything, even though he had pneumonia himself. (R. at 122). She stated that she rode in the car to the grocery store, thinking she could go in, but then she "felt too bad," and instead had to make a list for her husband. *Id.* It was difficult to get into a car. *Id.* She said she could not cook, do laundry, sew, drive, or clean house. (R. at 121).

At the hearing in 2009, Watkins testified that she used to be an executive secretary, but that she could no longer concentrate well enough nor could she type because of the

7

pain and swelling and arthritis in her fingers.³ (R. at 22, 29-30, 32). She testified that she fractured her left ankle in 2004 and was in a walking cast for six months, and then had to use a cane. (R. at 34, 36). She stated that since 2005, she could only wear tennis shoes a size too big because she had constant numbness and tingling in her feet caused by Guillain-Barre disease. (R. at 23). She had had severe left hip pain which caused her to use a walker for several years, the pain prevented her from sleeping, and pain medication did not work. (R. at 25). She stated she had fallen at least 10 times in the past month due to problems with her balance caused by the Guillain-Barre disease. (R. at 25-26). She testified that she had hip surgery in 2006, which relieved the pain somewhat, but it still hurt whenever she needed to lift her leg, like to get in a car or get up from or get in bed. (R. at 26-27).

Here, the ALJ failed to evaluate Watkins' activities and articulate how they could support a finding that she could perform sedentary level work on a regular and continuing basis, meaning eight hours a day, five days a week. *See Carradine v. Barnhart,* 360 F.3d 751, 755 (7th Cir. 2004) (ALJ "failed to consider the difference between a person's being able to engage in sporadic physical activities and her being able to work eight hours a day five consecutive days of the week"). The ALJ also omitted any reference to circumstances that aggravated Watkins' pain. The ALJ failed to articulate how the medical record was sufficient to show that Watkins had an impairment that could cause her alleged symptoms, while at the same time that same record was insufficient to support her testimony.

The ALJ "must justify the credibility finding with specific reasons supported by the record." *Terry v. Astrue,* 580 F.3d 471, 477 (7th Cir. 2009) (remanding ALJ's decision where credibility assessment was not supported by the record). Although the court grants special deference to the credibility determination made by the ALJ and generally will not overturn it unless it is "patently wrong," in this case the ALJ did not "build an accurate and logical bridge" from the evidence to his conclusions. *See Ribaudo v. Barnhart,* 458 F.3d 580, 584 (7th Cir. 2006) (ALJ's decision remanded because ALJ's reasons for his adverse credibility finding were flawed); *Zurawski v. Halter,* 245 F.3d 881, 887-88 (7th Cir. 2001). Under these circumstances, the court cannot affirm the ALJ's credibility analysis. On remand, the Commissioner must reassess Watkins' credibility in light of all of the evidence of record and the matters discussed above.

Watkins' final claim is that the ALJ failed to properly account for the impact of Watkins' obesity on her ability to function. The ALJ failed to acknowledge obesity as one of Watkins' impairments, even though it was noted throughout the record. On remand, the ALJ shall discuss the effect of Watkins' obesity on her other conditions.

In sum, the ALJ denied Watkins' claim because he concluded that there had been "no continuous period of 12 months when [Watkins] could not have performed at least sedentary work prior to her date last insured of December 31, 2006, or after and, therefore, could have returned to her past relevant work." (R. at 14). For all of the reasons discussed above, this conclusion is not supported by substantial evidence.

---

³The ALJ determined that arthritis in Watkins' hands and wrists was not supported by evidence of record. (R. at 11).

### III. Conclusion

The ALJ's conclusion that Watkins could perform a full range of sedentary work, including her past relevant work as an executive secretary, is not supported by substantial evidence. The court, therefore, is required to **remand** the case to the ALJ for further consideration. *Melkonyan v. Sullivan,* 501 U.S. 89, 98 (1991) (a court may remand the case after passing on its merits and issuing a judgment affirming, modifying, or reversing the Commissioner's decision, a "sentence four" remand).

On remand, the plaintiff shall be given the opportunity to present additional evidence. At step three of the analysis, the ALJ shall reconsider the entire record and shall consider the value of consulting with a medical expert to assist in making that medical determination. The ALJ shall also re-evaluate and more thoroughly discuss Watkins' credibility. The ALJ shall also discuss Watkins' obesity.

Judgment consistent with this Entry shall now issue.

**IT IS SO ORDERED.**

Date: 09/20/2010

_Sarah Evans Barker_
SARAH EVANS BARKER, JUDGE
United States District Court
Southern District of Indiana